IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MISTY M. LINDSAY,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:26-cv-0682<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Misty M. Lindsay filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 7. Following review, and for the reasons stated below, I AFFIRM the Commissioner's decision.

**Procedural background**

In November 2023, Lindsay protectively filed an application for supplemental security income.[1] Tr. 11, 231. She had previously applied for

---

1 "A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits. It may be used to establish an earlier application date than the date the Social Security Administration received the claimant's signed application." *Slaughter v. Astrue*, No. 3:09-cv-00233, 2010 WL 3909364, at *1 (S.D. Ohio Mar. 31, 2010), *report and recommendation adopted*, 2010 WL 3909360 (S.D. Ohio Sept. 30, 2010) (citing Glossary of Social Security Terms, Social Security Administration, http://www.ssa.gov/glossary). The Social Security Administration received Lindsay's application in December 2023. Tr. 393.

supplemental security income and disability insurance benefits, but all of her applications had been denied. *See* Tr. 118–44, 157–70. This time, Lindsay alleged a disability onset date of September 1, 2017,[2] Tr. 438, claiming that she was disabled and limited in his ability to work due to post-traumatic stress disorder (PTSD) and problems in her left ankle and both knees, Tr. 422. As before, the Commissioner denied Lindsay's application both initially, Tr. 258–61, and on reconsideration, Tr. 273–75. Lindsay requested a hearing before an administrative law judge (ALJ). Tr. 276.

In February 2025, Lindsay appeared and testified before an ALJ by video. Tr. 76, 82–102. Lindsay was represented by counsel. Tr.76. A qualified vocational expert, William Kiger, also testified. Tr. 102–14. At the hearing, the ALJ granted Lindsay three additional weeks to submit a medical opinion and recent treatment records from Brian Joseph Zimmerman, DPH, who had performed Lindsay's ankle surgery. Tr. 79. Dr. Zimmerman later submitted Lindsay's treatment records, but he never provided his medical opinion. *See* Tr. 977–1041. Months later, in April 2025, the ALJ issued a written decision finding that Lindsay was not disabled and therefore not entitled to benefits. *See* Tr. 10–24. The Appeals Council declined further review, making the ALJ's decision final. Tr. 1; *see* 20 C.F.R. § 404.981.

---

[2] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Lindsay timely filed this action in March 2026. Doc. 1. She assigns the following errors for review:

1. The ALJ's residual functional capacity is unsupported by substantial evidence.[3] The ALJ failed to follow the revised regulations and SSRs 96-8p and 16-3p.

2. The ALJ's residual functional capacity is unsupported by substantial evidence. The ALJ failed to develop the record regarding physical abilities and limitations.

Doc. 9, at 1.

**Evidence**[4]

*Personal and Vocational Evidence*

Lindsay was born in 1972, which makes her 45 years old on her alleged disability onset date. Tr. 408. She graduated from high school and received some college-level education. Tr. 162, 853. Lindsay also received special education until the fourth grade for her "issues [with] PTSD." Tr. 424. Her past employment included working as a restaurant cook and a line assembly

---

[3] A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

[4] The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs and relevant to their arguments.

worker, but Lindsay had no relevant work experience after January 2009, Tr. 424.

*Medical Evidence*

In July 2020, Lindsay visited a primary care provider after injuring her left shin at a grocery store. Tr. 553. Lindsay had a history of arthritis in her left ankle and multiple tendon repair surgeries in the area. Tr. 540. She had also had arthroscopic surgery on her right knee. Tr. 553. Although Lindsay reported shin pain, Tr. 553, she displayed no limping, no swelling, and only "faint" ecchymoses.[5] Tr. 555. A nurse practitioner instructed Lindsay to take Ibuprofen, apply ice, elevate her leg, and rest, but concluded that there was "[n]o need" for an orthopedic intervention at the time. Tr. 555. By September, Lindsay no longer showed ecchymoses. Tr. 482.

In November 2020, Lindsay received arthroscopic and lateral release surgeries for her bilateral knee chondromalacia.[6] Tr. 482. By January 2021, she still felt some weakness and discomfort in her knees, which also "occasionally g[ave] out." Tr. 482. Her physician, however, observed that Lindsay displayed a "full range of motion of the ankles, knees, and hips" and

---

[5] Ecchymosis is "a small hemorrhagic spot … in the skin or mucous membrane forming a non[-]elevated, rounded or irregular, blue or purplish patch." Dorland's Illustrated Medical Dictionary 582 (33rd ed. 2020). Ecchymoses is the plural form of ecchymosis. *Id.*

[6] Chondromalacia is "softening of the articular cartilage," which occurs "most frequently in the patella." Dorland's Illustrated Medical Dictionary 347 (33rd ed. 2020).

found no abnormality other than "mild knee effusion." Tr. 482. Lindsay also walked without an assistive device. Tr. 486. X-rays on both knees revealed "[s]mall superior patellar enthesophyte" and "[m]ild patellofemoral compartment marginal osteophytosis" but showed normal joint alignment and no acute fracture.[7] Tr. 484–85. The physician added that Lindsay's chondromalacia was chronic and not related to her earlier shin injury. Tr. 482. He offered Lindsay injections for her discomfort, but Lindsay instead opted for physical therapy, stating that she "does not like needles." Tr. 482. Months later, Lindsay reported that "physical therapy ha[d] helped quite a bit" and that she felt that she was "getting better every day and getting stronger every day." Tr. 486.

Even a year after the surgery, however, Lindsay continued to report "some pain and discomfort" in her knees. Tr. 490. She walked without an assistive device and retained a "full range of motion of" her ankles and knees, showing "[n]o ligamentous instability." Tr. 490. But her knee X-rays "reveal[ed] minor medial compartment joint narrowing as well as minor patellofemoral joint narrowing." Tr. 490. While Lindsay maintained that her

---

[7] Enthesophytes and osteophytes are two different "skeletal responses to stress." *Foster v. Colvin*, No. 5: 14-407, 2015 WL 5680346, at *4 n.3 (E.D. Ky. Sept. 25, 2015). Enthesophyte means "a bony spur forming at a ligament or tendon insertion into bone." *Id.* n.2. (citation omitted). "An osteophyte is a lateral outgrowth of bone that is associated with osteoarthritis." *Id.* n.3 (citation omitted).

pain was "tolerable" and refused injections, she agreed to try physical therapy and wear braces at home. Tr. 490.

Meanwhile, in November 2021, Lindsay visited Dr. Zimmerman with complaints of left ankle pain and some "minor soreness" in her right ankle, although the soreness was not as significant as her left ankle pain. Tr. 681. Lindsay reported that she had sustained a lower leg injury earlier that year and was seeing a pain management specialist, who prescribed Cymbalta and pain creams for complex regional pain syndrome. Tr. 681. Dr. Zimmerman diagnosed Lindsay with sinus tarsi syndrome in her left foot and offered a cortisone shot,[8] but Lindsay again declined. Tr. 681. Dr. Zimmerman instead sent Lindsay for physical therapy, instructing her to return in a month if her symptoms did not improve. Tr. 681. There is no record that Lindsay followed up. *See* Tr. 720.

A year later, in December 2022, Lindsay still felt "some pain and discomfort in her left knee," which now "radiate[d] down [her] anterior lower leg." Tr. 492. She visited her pain management specialist and described the lower leg pain as "[s]hooting," rating it six out of ten. Tr. 672. Lindsay also reported feeling weakness, numbness, and tingling in the left leg. Tr. 672. The

---

[8] Sinus tarsi syndrome is "painful swelling on the outside of the joint below the ankle known as the subtalar joint." *Alt v. McDonough*, No. 21-0347, 2021 WL 5176755, at *1 n.2 (Vet. App. Nov. 8, 2021) (citation omitted). Sinus tarsi syndrome causes "localized pain between the ankle and heel bone," along with "a feeling of instability and aggravation by weight bearing activity." *Henry D. v. Saul*, No. 19-C-6825, 2021 WL 1748233, at *2 n.4 (N.D. Ill. May 4, 2021) (citation and internal quotation marks omitted).

pain management specialist, however, noted that Lindsay did not have any bruising or edema, and her range of motion in her ankle was intact. Tr. 673. An ultrasound Lindsay's left anterior shin was "grossly unremarkable." Tr. 673. Lindsay requested and received a knee brace, but she insisted that "injections [would] not work for her." Tr. 492–93. A few months later, Lindsay reported that her pain remained "[s]hooting" and "sharp" but had slightly improved. Tr. 665. Although Lindsay still felt "little tingling" in her left leg, she denied experiencing any weakness. Tr. 665.

Around this same time, Lindsay began attending monthly counseling sessions with Jodi Willett, Licensed Professional Clinical Counselor Supervisor, to discuss Lindsay's PTSD. Tr. 839–44. During these sessions, Lindsay reported that she was "struggling with [her] relationship with her husband," Tr. 822, and that she was working on a book, Tr. 826, which "brought up some trigger points for her," Tr. 828. Lindsay, however, "manag[ed] things overall well." Tr. 831. She maintained good relationships with her daughters, grandchildren, and other family members. Tr. 831. She also had a good relationship with her niece, Tr. 831, whom Lindsay had cared for over years, *see* Tr. 947. Willett consistently observed that Lindsay posed no danger to herself or others. *See, e.g.*, Tr. 829, 831, 837. Over the subsequent months, Lindsay demonstrated progress in interacting with her husband and getting her book published. Tr. 915, 917.

Lindsay returned to Dr. Zimmerman in February 2023, reporting that she had sprained both ankles. *See* Tr. 684–89. Dr. Zimmerman noted that despite her history of left ankle surgeries, Lindsay "had been holding up well until this injury." Tr. 684. X-rays showed inferior calcaneal heel spur in both ankles and os trigonum in her left ankle,[9] but revealed no fractures or dislocations. Tr. 685. Later that month, Lindsay reported that her left foot had "flared up." Tr. 690. Dr. Zimmerman prescribed a Medrol Dosepak and instructed Lindsay to continue physical therapy. Tr. 690. The following month, when Lindsay complained that physical therapy was not helping, Dr. Zimmerman also ordered MRIs of both ankles and prescribed a walker boot for Lindsay's left ankle. Tr. 693, 695–99.

A left ankle MRI showed an anterior talofibular ligament rupture and a sprain of the calcaneofibular ligament. Tr. 712–13, 880. Dr. Zimmerman also observed "[d]egenerative arthritis" in the tarsometatarsal joints, "which appear[ed] more prominent than on the previous foot MRI of 2019." Tr. 713. There was, however, no acute fracture and no tear or inflammation of Lindsay's tendons. Tr. 713. Dr. Zimmerman prescribed a Medrol Dosepak and Mobic for the instability and swelling in Lindsay's left ankle. Tr. 711, 715. In June 2023, Lindsay told Dr. Zimmerman that she had no interest in ankle surgery and was "willing to live with her current symptoms." Tr. 715. Weeks later, Lindsay

---

[9] An *os trigonum* is "an extra bone behind the ankle." *Anderson v. Comm'r of Soc. Sec.*, No. 5:22-cv-1766, 2023 WL 4187968, at *2 (N.D. Ohio Apr. 26, 2023).

once again declined surgery in favor of conservative treatment, which included wearing an "ankle-foot orthosis to control left ankle instability" and taking "[M]eloxicam for the pain." Tr. 719.

Dr. Zimmerman observed that Lindsay "seem[ed] to be doing fairly well" with the conservative treatment. Tr. 732. In September 2023, however, Lindsay returned to the pain clinic, reporting sharp and stabbing pain in her left leg and ankle. Tr. 657. Lindsay rated the pain a ten out of ten at its maximum. Tr. 657. The pain "increased with running and inactivity," and improved "by relaxation, pain medication, heating pad, and TENS unit."[10] Tr. 657. While Lindsay also reported "occasional weakness to [her] left leg," she denied numbness or tingling. Tr. 657. Left foot X-rays revealed "joint space narrowing and squaring off of the metatarsal head with dorsal spurring." Tr. 724. In October 2023, Dr. Zimmerman offered Lindsay a cortisone shot, but she responded that it would not be "necessary." Tr. 732. Dr. Zimmerman instead refilled Lindsay's Meloxicam. Tr. 732.

In December 2023, Dr. Zimmerman administered lidocaine to relieve Lindsay's pain and ordered another left ankle MRI to determine the need for surgery. Tr. 739. The following month, after discussion with Dr. Zimmerman, Tr. 883, Lindsay underwent left ankle surgery, Tr. 880–81. For months

---

10 "TENS stands for transcutaneous electrical nerve stimulation and is a back pain treatment that uses low voltage electric current to relieve pain." *Martinez v. Hiland*, No. 5:13-cv-P182, 2017 WL 4799861, at *1 n.2 (W.D. Ky. Oct. 24, 2017) (citation omitted).

thereafter, Lindsay consistently expressed that her ankle was "doing pretty good." *See* Tr. 867, 871, 875. By May 2024, Lindsay had completed her physical therapy, stating that "she [could] do it on her own." Tr. 867. In August, Lindsay told Dr. Zimmerman that her "left ankle ha[d] not given out" or felt weak since the surgery. Tr. 1027. She also "ha[d] been active" throughout the summer, Tr. 1027, and had no problems with ankle pain or instability for the remainder of 2024, *see* Tr. 994, 1009.

While addressing her left ankle impairment, Lindsay continued her counseling sessions with Willett. *See* Tr. 915–30, 957–70. In February 2024, about a month after the ankle surgery, Lindsay stated that her "limitations … in being able to get out of [her] house on her own" had affected her relationship with her husband. Tr. 923. During a session in late May, Lindsay was "tearful," expressing "a lot of doubts about her caring for her niece." Tr. 929. By July, however, Lindsay was again "feeling good about herself" and was "able to walk away from" potential conflicts with her husband. Tr. 968. Willett assessed that Lindsay's PTSD symptoms were overall "being managed well" and had become "less intense." Tr. 969. The following month, Lindsay reported stress from "difficult situations," Tr. 961, but she returned to "a good mood" by November, "feeling good about … how she ha[d] handled the stressors in her life," Tr. 957. Throughout this time frame, Willett continued to note that Lindsay posed no danger to herself or others and that she made progress in effectively managing her daily life stressors. *See, e.g.*, Tr. 957, 959, 961.

*Medical Opinion Evidence*

In April 2024, Lindsay attended a psychological consultative examination by Diane Bonfiglio, Ph.D. *See* Tr. 852–56. During the exam, Lindsay was oriented, Tr. 855, acted in a pleasant and polite manner, Tr. 854, and displayed a normal and appropriate affect, Tr. 855. She made good eye contact, answered questions appropriately, and exhibited no unusual behavior. Tr. 854. Her thoughts were logical and organized, and there was no evidence of psychosis. Tr. 855. Although Lindsay reported symptoms of PTSD and bipolar disorder, she felt that her symptoms had improved and found her treatment regimen helpful. Tr. 855. She showed "no overt indication of anxiety such as motor tremor, facial expressions, or voice inflections." Tr. 855. Dr. Bonfiglio concluded that Lindsay could handle "routine, non-speeded work activities but, due to her current psychological status, would have problems dealing with the stress of speeded, changing and/or tasks that require frequent decision-making." Tr. 856. Dr. Bonfiglio added that "[w]orking on a large or changing team, or in an environment that requires frequent interaction with the public, … would exacerbate [Lindsay's] psychological symptoms." Tr. 856.

State agency psychologists, both initially and on reconsideration, found Dr. Bonfiglio's opinion to be "supported and consistent with the evidence on file." Tr. 226, 237. They concluded that Lindsay had only mild limitations in interacting with others and in concentrating, persisting, or maintaining pace.

Tr. 226, 237. The psychologists noted that Dr. Bonfiglio's opinion was not "more restrictive than [their] findings." Tr. 226, 237.

As for Lindsay's physical RFC, state agency physicians adopted the RFC findings from Lindsay's prior disability benefits proceedings. Tr. 227, 239. The physicians determined that Lindsay could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds,[11] with no pushing or pulling limitations in either her upper or lower extremities. Tr. 226, 237. They also found that Lindsay could sit, stand, or walk for up to six hours during a workday, Tr. 226, 237, and that she was capable of frequently balancing and occasionally climbing ramps and stairs, stooping, crouching, and crawling. Tr. 227, 238. Lindsay, however, was incapable of climbing ladders, ropes, or scaffolds, and was incapable of kneeling. Tr. 227, 238. The physicians added that Lindsay must avoid all exposure to hazards, such as machinery and heights, and concentrated exposure to vibration. Tr. 227, 238.

In February 2025, shortly before Lindsay's administrative hearing, Willett completed a check-box questionnaire regarding Lindsay's mental

---

11 "'Frequently' is a term of art in the disability context" and means "activity that is performed … from as little as 1/3 of the time up to (but not exceeding) 2/3 of the workday." *See Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *8 (N.D. Ohio June 11, 2018) (citing the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C,* U.S. Dept. of Labor (1993) and Soc. Sec. Ruling 83-10, 1983 WL 31251, at *6 (SSA Jan. 1, 1983)), *report and recommendation adopted,* 2018 WL 3126552 (N.D. Ohio June 26, 2018). "Occasionally" means performing an activity for "up to 1/3 of the time." *See Selected Characteristics*, *supra*, and Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5.

"ability to do work-related activities." Tr. 973. By checking boxes, Willett opined that Lindsay would "likely be off-task at least 20% of the time" and be absent about four days per month due to her "PTSD symptoms" and "triggers." Tr. 974. Willett also indicated that Lindsay had serious limitations in responding appropriately to co-workers, customary work pressures, or changes in the work setting. Tr. 974. Willett then wrote: "even though [Lindsay] ha[d] seen improvements, increased pressure [and] stress do impact her abilities." Tr. 973. Finally, Willett added that a medication regimen would be "helpful for [Lindsay's] emotional stability." Tr. 974.

*Hearing Testimony*

Lindsay appeared and testified by video at the February 2025 administrative hearing. Tr. 82–102. Lindsay reported that since her ankle surgery in January 2024, she had followed up with Dr. Zimmerman every four to six weeks, Tr. 89, but her ankle had been "getting worse," Tr. 82. According to Lindsay, Dr. Zimmerman instructed her to "just try using [her] crutches," rather than a knee scooter, "put some weight on" her ankles, and walk around as much as she could. Tr. 90. Lindsay said that she followed these instructions by using her scooter only "off and on," Tr. 87, such as "[t]o get around" her house, Tr. 86, but her pain remained the same, Tr. 90.

Lindsay could stand for no more than ten minutes "[b]ecause the pain gets so bad." Tr. 83. Walking was even harder for her because she had to "shift[] the weight back and forth." Tr. 83. Lindsay also felt pain when she tried to

balance on both legs. Tr. 94. As a result, Lindsay could not climb stairs and had to descend them one step at a time, "like a little baby learning how to walk." Tr. 94. At home, Lindsay would "recline … in the living room in the chair" for most of the day, with her foot elevated to waist level. Tr. 88. Lindsay used ice packs and Tylenol for pain relief. Tr. 83. Lindsay, however, clarified that Tylenol only "gives [her] a little bit of relief" and "doesn't take the pain away." Tr. 83.

Lindsay also described her daily routine and household activities. On a typical morning, she would get up, do her morning prayer, brush her teeth, and lie back down. Tr. 98. Lindsay said that she started her day only once she felt "a little better." Tr. 98. Lindsay left her home about three or four times a week, Tr. 98, mostly for grocery shopping and medical appointments, Tr. 99. Lindsay could drive, but she preferred that her husband drive because sitting down and getting up caused her pain. Tr. 98. Lindsay also often needed someone else to go to the grocery store and shop for her. Tr. 82. When she had to go herself, she would "just get a few things" from the store and return home, taking "no more than [ten] minutes." Tr. 84. Once returning home, she would rest on a couch for a few hours. Tr. 83. About three times a week, Lindsay prepared a full meal, although she had to pause and sit while cooking because of her ankle pain. Tr. 82–83.

Regarding her mental health, Lindsay reported that her condition had "gotten worse" and that she had to deal with "a lot of triggers." Tr. 100. She

sometimes could not follow conversations without asking questions because "it's hard [for] her to concentrate." Tr. 99. Lindsay experienced sleep difficulties and sometimes could not get out of bed, but at other times, she would "just wake up 3:00 in the morning and [not] go back to bed till about 5." Tr. 101–02. Lindsay also experienced mood swings, although she believed that they were under control. Tr. 101. She attended therapy once a month, finding that it was helpful and sometimes helped her to function better. Tr. 101. Lindsay denied taking any medications, explaining that they made her "sleepy and loopy." Tr. 100–01.

Qualified vocational expert William Kiger next testified. Tr. 102–14. The ALJ asked Kiger to determine whether a hypothetical individual with the same age, education, and work experience as Lindsay could find employment if the individual had the limitations assessed in the ALJ's RFC determination, which are described below. Tr. 103–08. Kiger testified that the hypothetical individual could perform jobs such as a marker or routing clerk. Tr. 104, 106, 108. Kiger, however, stated that the individual would not be able to find a job if she required an assistive device for ambulation. Tr. 108. Similarly, Kiger observed that a hypothetical individual would not be able to find competitive employment if she needed to be off-task for at least 20 percent of the workday or miss two or more days of work per month. Tr. 108–09.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 6, 2023, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: Mild bilateral patellofemoral arthritis; [] moderate and moderate to severe degenerative arthritis of the second and third tarsometatarsal joints of the left ankle; other degenerative changes of the ankle; status-post arthroscopic ankle surgery; sinus tarsi syndrome of the left ankle; stable mild osteoarthritis talonavicular joint, remote, grade three sprain of the anterior talofibular ligament and remote grade two sprain calcaneofibular ligament; status-post left ankle arthroscopy with Brodstrom stabilization and synovectomy; obesity; moderate left trigonum with mild degenerative change synchondrosis; post-traumatic stress disease (PTSD); and bipolar disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except for the following restrictions: She could lift 20

pounds occasionally and 10 pounds frequently. She could carry 20 pounds occasionally and 10 pounds frequently. She could sit for six hours during an eight-hour workday. She could stand for six hours during an eight-hour workday but would need the option to alternate to sitting for five minutes after every 30 minutes of standing without being off task or away from the work station. She could walk for six hours of an eight-hour workday but would need to alternate to sitting for five minutes after every 30 minutes of standing without being off task or away from the workstation. She could push/pull as much as could lift/carry. She could operate foot controls with left foot frequently. She could climb ramps and stairs occasionally. She could never climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch, or crawl. She could never work at unprotected heights. She could never work around moving mechanical parts. She could occasionally work operating a motor vehicle. She could never work around vibration. She could perform simple, routine tasks. She could perform simple work-related decisions. She could frequently interact with coworkers, supervisors, and the public.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant … was 51 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

> 7. The claimant has at least a high school education (20 CFR 416.964).
>
> 8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).
>
> 9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).
>
> 10. The claimant has not been under a disability, as defined in the Social Security Act, since November 6, 2023, the date the application was filed (20 CFR 416.920(g)).

Tr. 13–24.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ must follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v.*

*Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

1. *The ALJ made no reversible error in assessing the medical opinion evidence.*

Lindsay first challenges the ALJ's mental RFC determination, contending that the ALJ erred in evaluating the medical opinions of Dr. Bonfiglio and Willett.[12] *See* Doc. 9, at 12–18. When determining a claimant's RFC, an ALJ must consider all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). In turn, when assessing the persuasiveness of a medical opinion, the ALJ must consider the following factors: supportability; consistency; treatment relationship; specialization; and other factors. 20 C.F.R. § 404.1520c(c)(1)–(5). Supportability and consistency are the most important factors, 20 C.F.R. § 404.1520c(a), and "[t]o pass muster, the ALJ need only explain 'how [he] considered the supportability and consistency factors for a medical source's medical opinions.'" *Gregory v. Comm'r of Soc. Sec.*, No. 26-

---

[12] In her opening brief, Lindsay also mentions in passing that the ALJ erred in evaluating complaints of subjective symptoms under Social Security Ruling 16-3p. *See* Doc. 9, at 9–10; *see also* Soc. Sec. Ruling 16-3p, 2017 WL 5180304 (SSA Oct. 25, 2017). Lindsay, however, offers virtually no argument as to how the ALJ erred or how this alleged error warrants reversal. She also makes no mention of SSR 16-3p or subjective symptoms in her reply. *See* Doc. 13. Because this claim is undeveloped, Lindsay has forfeited it. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal citations omitted).

5022, 2026 WL 1763752, at *2 (6th Cir. June 18, 2026) (quoting 20 C.F.R. § 404.1520c(b)(2)). ALJs need not explain how they considered the remaining factors. 20 C.F.R. § 404.1520c(b)(2).

As to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[ ] … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be." 20 C.F.R. § 404.1520c(c)(2). Put simply, "'consistency is about how the medical opinion conflicts with evidence in the record, whereas supportability is about how the medical opinion was soundly reached.'" *Baum v. Comm'r of Soc. Sec. Admin.*, No. 1:25-cv-01775, 2026 WL 1753609, at *6 (N.D. Ohio June 18, 2026) (quoting *David C. v. Comm'r of Soc. Sec.*, No. 22-11292, 2023 WL 7345924, at *2 n.1 (E.D. Mich. Nov. 7, 2023)).

Lindsay claims that the ALJ improperly discounted Dr. Bonfiglio's opinion as "only partially persuasive" without sufficiently explaining "why the opinion is less than full[y] persuasive." Doc. 9, at 16–17. Dr. Bonfiglio opined that Lindsay could "concentrate and persist in routine and non-speeded" work activities but "would have problems dealing with … tasks that require frequent decision-making." Tr. 856. Dr. Bonfiglio also observed that Lindsay could "understand, remember, and carry out simple instructions" but would find it

"problematic" to work "on a large or changing team, or in an environment that requires frequent interaction with the public." Tr. 856. When evaluating this opinion, the ALJ acknowledged that "Dr. Bonfiglio supported her assessments by reiterating observations she made during her consultative examination." Tr. 21. Likewise, the ALJ noted that Dr. Bonfiglio's opinion "generally comport[ed] with counseling notes in the record." Tr. 21. Then, however, the ALJ concluded that the opinion was "only partially persuasive," explaining that "[t]he vague nature of Dr. Bonfiglio's assessments limits their persuasiveness." Tr. 21.

The ALJ did not err in discrediting Dr. Bonfiglio's opinion. To begin, the ALJ followed the regulations by articulating her analysis under the supportability and consistency factors. *See* Tr. 21; 20 C.F.R. § 404.1520c(b)(2). Moreover, as Lindsay admits in her opening brief, "the vagueness of a medical opinion is a [valid] consideration" in assessing the opinion's persuasiveness. Doc. 9, at 17; *see Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434 (6th Cir. 2018) (holding that "[v]agueness, or the failure to propose specific functional limitations, can be a reason to discount a medical opinion"); *Katelyn M. v. Comm'r of Soc. Sec.*, No. 2:23-cv-12276, 2024 WL 4124675, at *10 (E.D. Mich. Sept. 9, 2024) ("[A]n ALJ can properly discount the weight of an expert opinion when it is too vague and does not support specific functional limitations."). "An ALJ might deem a medical opinion to be vague … if it 'does not specify any quantifiable or other particular physical or mental limitations

associated with [the claimant's] impairments.'" *Stratton v. Comm'r of Soc. Sec.*, No. 3:24-cv-01972, 2025 WL 2025559, at *8 (N.D. Ohio July 21, 2025) (quoting *Ritter v. Comm'r of Soc. Sec.*, No. 1:12-cv-122, 2013 WL 427572, at *5 (S.D. Ohio Feb. 4, 2013), *report and recommendation adopted*, 2013 WL 1281738 (S.D. Ohio Mar. 26, 2013)). Here, despite observing that Lindsay "would have problems" working with a "large" team, Dr. Bonfiglio did not explain what constitutes a "large" team or identify specific "problems" that Lindsay may face. *See* Tr. 856. The opinion was thus vague, and the ALJ did not err in discounting it. *See Lambert v. Comm'r of Soc. Sec.*, No. 1:25-cv-02302, 2026 WL 2920189, at *9 (N.D. Ohio Sept. 29, 2026) (holding that an ALJ "rightly omitted" a physician's vague opinion).

In maintaining that the ALJ erred, Lindsay highlights *Whited v. Comm'r. of Soc. Sec.*, No. 5:24-cv-2199, 2025 WL 3267891, at *17 (N.D. Ohio Nov. 24, 2025), *report and recommendation adopted*, 2025 WL 3451746 (N.D. Ohio Dec. 1, 2025). *Whited*, however, is distinguishable. There, state agency psychological consultants opined that it would be "problematic" for the claimant to "learn[] novel skills" and that he might "need assistance in learning new tasks and time to transition to task changes." *Whited*, 2025 WL 3267891, at *18. At the administrative hearing, the ALJ noted that the agency consultants' language was "very vague" in terms of the "level of assistance and time" or "[h]ow much time to transition." *Id.* at *12, 18. But the ALJ subsequently asked the vocational expert to "shed light on that vagueness" by

clarifying "what acceptability would be for [] additional assistance in learning new tasks and transition time or task changes." *Id.* at *12, 18. The ALJ's written decision contained no indication that "the relevant limitations were excluded because they were vague." *Id.* at *20. Here, on the other hand, neither the ALJ nor Lindsay attempted to clarify the vagueness through vocational expert testimony, *see* Tr. 102–14, and the ALJ's decision explicitly discounted Dr. Bonfiglio's opinion on vagueness grounds, Tr. 21.

Lindsay also disputes the ALJ's assessment of Willett's opinion, *see* Doc. 9, at 12–13, but this challenge fares no better. In the written decision, the ALJ explained that Willett's opinion was "not persuasive" because the opinion did "not comport with the longitudinal evidence" and "nothing in the record indicate[d] … [Lindsay] would miss work four times a month." Tr. 21. The longitudinal evidence, according to the ALJ, reflected "the progress that [Lindsay] made in her therapy and the various activities she performed, including writing a book and caring for her niece." Tr. 21. In challenging this assessment, Lindsay counters that the ALJ overlooked counseling notes from "periods of worsening" that could support Willett's opinion. Doc. 9, at 13. In essence, Lindsay argues that the ALJ selectively considered, or "cherry-picked," the evidence of her improved mental health to discount Willett's opinion.

As courts have recognized, however, these sorts of arguments are "seldom successful." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir.

2014); *Phillips v. Berryhill*, No. 3:16-cv-0193, 2017 WL 6045451, *at 5 (W.D. Ky. Dec. 6, 2017); *Smith v. Comm'r of Soc. Sec.* No. 1:14-cv-0984, 2015 WL 7460080, at *3 (W.D. Mich. Nov. 24, 2015). An ALJ errs when the ALJ simply ignores a conflict between a medical opinion and the RFC finding, while failing to explain why she chose to credit one item of evidence over another. *Howell v. Comm'r of Soc. Sec.*, No. 3:25-cv-1206, 2026 WL 1109373, at *17 (N.D. Ohio April 24, 2026), *report and recommendation adopted*, 2026 WL 1615242 (N.D. Ohio June 5, 2026). But "[i]t is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered." *Thomas v. Bisignano*, No. 1:23-cv-00612, 2026 WL 376857, at *7 (N.D. Ohio Feb. 11, 2026), *report and recommendation adopted*, 2026 WL 775557 (N.D. Ohio Mar. 19, 2026); *see also Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (explaining that an ALJ need not discuss every piece of evidence in the record). This is because "a duty to 'consider' the evidence is different than a duty to 'discuss' the evidence." *Swain v. Comm'r of Soc. Sec. Admin.*, Case No. 1:24-cv-02224, 2025 WL 2322785, at *7 (N.D. Ohio Aug. 12, 2025).

Here, rather than "pick[ing] out a few isolated instances of improvement," the ALJ carefully considered "reports of 'improvement' … with an understanding of [Lindsay's] overall well-being." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). More specifically, the ALJ reviewed Willett's counseling notes from January 2023 through November 2024, and concluded that Lindsay was "responding well to treatment" and made "progress …

through therapy." Tr. 20. The ALJ also considered Willett's assessment from July 2024, which recognized that while Lindsay "continue[d] to have some PTSD symptoms," the symptoms were "being managed well" and had grown "less intense." Tr. 969; *see Barclift v. Comm'r of Soc. Sec. Admin.*, No. 3:22-cv-0999, 2023 WL 12242026, at *7 (N.D. Ohio July 5, 2023) (rejecting a cherry-picking argument where an ALJ acknowledged the claimant's ongoing mental health symptoms alongside "improvements with medication compliance"). In sum, the evidence highlighted by the ALJ is not indicative of temporary improvement, but "*in fact* constitute[s] examples of a broader [and sustained] development." *Garrison*, 759 F.3d at 1018. The ALJ did not "ignor[e] evidence that points to a disability finding," *Smith v. Comm'r of Soc. Sec.*, No. 1:11-cv-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013), or "significantly mischaracterize[]" the medical record, *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016). As a result, Lindsay's argument fails.

But even if the ALJ erred in her assessment of Willett's opinion, that error would be harmless. *See Whalen v. Comm'r of Soc. Sec.*, No. 1:24-cv-01928, 2025 WL 1452713, at *12 (N.D. Ohio May 21, 2025) ("Courts in this district … have applied the harmless error standard when evaluating an ALJ's treatment of an expert medical opinion"), *report and recommendation adopted*, 2025 WL 1756524 (N.D. Ohio June 25, 2025). "An error in an ALJ's evaluation of the opinion evidence may be harmless … when the opinion was 'so patently

deficient that the [ALJ] could not possibly credit it.'" *Croft v. Comm'r of Soc. Sec.*, No. 3:22-cv-00511, 2022 WL 17717495, at *8 (N.D. Ohio Nov. 10, 2022) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)).

In this case, Willett gave her opinion simply by responding to a check-box questionnaire, while offering almost no explanation for any of her answers. *See* Tr. 973–74; *Croft*, 2022 WL 17717495, at *9 (finding harmless error when a physician "gave little to no explanation" to support his opinion). As courts have held, a check-box opinion is "weak evidence at best," *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016), and may be discounted "even when the ALJ did not specifically call attention to it in the decision," *Marks v. Comm'r of Soc. Sec.*, No. 1:16-cv-02848, 2018 WL 1801609, at *8 (N.D. Ohio Jan 12, 2018). Even though Willett added in the questionnaire that "increased pressure [and] stress do impact [Lindsay's] abilities," this brief commentary is vague at best and does not articulate any functional limitation. *See Lambert*, 2026 WL 2920189, at *9 (holding that an ALJ "rightly omitted" a vague medical opinion); *see also Pica Ortiz v. Comm'r of Soc. Sec.*, No. 1:23-cv-00879, 2024 WL 1660131, at *8 (N.D. Ohio Mar. 13, 2024) (holding that a physician's "limited explanations" did not change "the checkbox form-nature of [the physician's] opinions") (listing cases), *report and recommendation adopted*, 2024 WL 1655786 (N.D. Ohio Apr. 17, 2024). In sum, Willett's check-box opinion was "patently deficient," excusing as harmless any alleged error in assessing the opinion. *Croft*, 2022 WL 17717495, at *8.

In maintaining that Willett's opinion was not deficient, Lindsay relies on *Whalen*, 2025 WL 1452713, at *13. But in *Whalen*, another unit of this Court "disagree[d] with the Commissioner's characterization of [a physician's] opinion as a 'checkbox opinion.'" 2025 WL 1452713, at *13. Indeed, even the Commissioner in *Whalen* acknowledged that the medical opinion "included several explanatory observations." 2025 WL 1452713, at *13. There, the physician supported her opinion by referencing the claimant's symptoms and limitations, such as "severe pain in [the] back, shoulders, hips, knees, [and] legs," "inability to walk more than ten steps," and "limited range of motion in … arms and lower extremities." *Whalen*, 2025 WL 1452713, at *13. She also detailed the claimant's "unsuccessful conservative treatments" and medication side effects. *Id.* And the physician's medical opinion was accompanied by the claimant's medical records, "which included progress notes, objective findings, and observations." *Id.* In contrast here, Willett did not attach her counseling notes or any other supporting documents to the check-box questionnaire. *See Croft*, 2022 WL 17717495, at *9 (holding that a physician's opinion was deficient because the physician "did not incorporate any treatment notes or attach any other supporting documents to her opinion"). Indeed, aside from general observations that "medication is helpful for [Lindsay's] emotional stability," and "increased pressure [and] stress do impact [Lindsay's] abilities," Tr. 973. Willett did not discuss any specific symptom, treatment, or side effect in her opinion, *see* Tr. 973–74. *Whalen* is therefore inapposite.

For these reasons, the ALJ made no reversible error in assessing the medical opinion evidence.

2. *The ALJ did not err in crafting the physical RFC.*

In her second assignment of error, Lindsay challenges the ALJ's physical RFC determination, contending that "[t]he ALJ failed to identify the evidence supporting the physical abilities and limitations within the RFC." Doc. 9, at 18. To be clear, Lindsay acknowledges that the ALJ's written decision contained a summary of "treatment notes relating to [her] lower extremity impairments," but she insists that the summary "'does not allow the Court to trace the ALJ's path of reasoning'" and does not explain "'how the ALJ weighed … evidence.'" Doc. 9, at 18 (quoting *Battaglia v. Comm'r of Soc. Sec. Admin.*, No. 1:22-cv-01459, 2023 WL 3900356, at *16 (N.D. Ohio June 8, 2023)).

Not quite so. Here, after reviewing medical providers' notes, the ALJ observed that Lindsay had "exhibited relatively unremarkable clinical signs" and had "repeatedly opted to treat [her] impairments conservatively" before undergoing the left ankle surgery. Tr. 19 (citing Tr. 715, 789, 805). The ALJ also reviewed medical records after the surgery, concluding that Lindsay "reported doing well" on multiple occasions and "demonstrated improvement." Tr. 20 (citing Tr. 867, 1009). Still, the ALJ acknowledged that Lindsay's physical impairments "warrant[ed] some limitations" and "restricted [Lindsay] to performing a range of work at the light exertional level subject to additional postural and environmental restrictions." Tr. 21. The ALJ did not "leav[e] this Court to wonder what specific evidence [she] relied on" in formulating the

physical RFC, *Battaglia*, 2023 WL 3900356, at *16, but offered specific explanations for the weight that she gave to all relevant evidence, *see Hamm v. Comm'r of Soc. Sec.*, No. 1:25-cv-00423, 2025 WL 3687383, at *8 (N.D. Ohio Dec. 19, 2025) (distinguishing *Battaglia* from the case where "[t]he ALJ ma[de] specific citations to treatment records" and made them "readily discernible" when explaining the inconsistencies between a medical opinion and the RFC findings).

Lindsay next argues that the ALJ lacked sufficient information to formulate the physical RFC, Doc. 9, at 20, because the ALJ found the state agency physicians' opinions unpersuasive, Doc. 9, at 23; *see also* Tr. 21, and Dr. Zimmerman never provided a medical opinion, Doc. 9, at 21.[13] In *Mokbel-*

---

[13] In her opening brief, Lindsay relies on so-called *Deskin* rule, Doc. 9, at 22, which originated from *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 911 (N.D. Ohio 2008). In *Deskin*, the court held that if "the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations … the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." 605 F. Supp. 2d at 911. Yet, as Lindsay admits in her reply brief, courts in this District have since "criticized *Deskin*," Doc. 13, at 10; *Berrier v. Comm'r of Soc. Sec.*, No. 3:20-cv-1655, 2022 WL 189855, at *2 (N.D. Ohio Jan. 21, 2022); *see also Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023) ("*Deskin* is a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law.").

In any event, *Deskin* does not apply here, as the record contains state agency physicians' opinions. *See Walker v. O'Malley*, No. 1:23-cv-00085, 2024 WL 4351422, at *6 (E.D. Tenn. Sept. 30, 2024) (holding that *Deskin* does not apply where the record contained stage agency consultants' opinions, even though the ALJ found them to be unpersuasive); *Iley v. Comm'r of Soc. Sec.*, No. 1:25-cv-01381, 2026 WL 1993176, at *26 (N.D. Ohio July 10, 2026) (rejecting a claimant's *Deskin* argument that "[t]he ALJ was required to obtain an additional medical opinion … because she did not find the state agency

*Aljahmi v. Comm'r of Soc. Sec.*, however, the Sixth Circuit rejected a similar argument. 732 F. App'x 395, 401 (6th Cir. 2018). In *Mokbel-Aljahmi*, the claimant argued that "once [an] ALJ decided to give no weight to … physicians' opinions regarding [the claimant's] ability to work," the ALJ must obtain another physician's opinion before determining the RFC. 732 F. App'x at 401. The Sixth Circuit "disagree[d]" and found no error because "[t]he ALJ undertook a laborious evaluation of the medical record when determining the [RFC], and [because] substantial evidence support[ed] the ALJ's conclusions." *Id.* at 401–02; *see also Espino v. Comm'r of Soc. Sec.*, No. 5:22-cv-01544, 2023 WL 4107923, at *12–13 (N.D. Ohio June 21, 2023) (discussing *Mokbel-Aljahmi* and its progeny). Here, as discussed above, the ALJ rested her RFC determination on substantial evidence, including treatment records spanning several years. *See* Tr. 20–21. And, in her reply brief, Lindsay concedes that "a medical opinion is not required for the formulation of an RFC." Doc. 13, at 10. Lindsay's claim, therefore, has no merit.

Finally, Lindsay suggests that the ALJ "play[ed] doctor" and "interpret[ed] … raw medical evidence to formulate the RFC." Doc. 9, at 20–21. While Lindsay is correct that ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." Doc. 9, at 21 (quoting *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x. 181, 194 (6th Cir. 2009)),

---

opinions whole persuasive"), *report and recommendation adopted*, 2026 WL 2151753 (N.D. Ohio July 27, 2026).

an ALJ is not precluded from evaluating medical evidence, *see Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence"). Indeed, "[f]ar from prohibiting ALJs from directly evaluating medical evidence, the law requires it." *Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 WL 7622634, at *5–6 (N.D. Ohio Nov. 15, 2023); *see also Coldiron*, 391 F. App'x at 439 (highlighting that it is the role of an ALJ, not of a physician, to determine the RFC). An ALJ impermissibly plays doctor only when she "interpret[s] *raw medical data beyond her ability*." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726 (6th Cir. 2013) (emphasis added).

Here, Lindsay does not identify any instance where the ALJ improperly interpreted raw medical data or made her own medical finding. *See* Doc. 9, at 20–21. Nor is any instance evident in the ALJ's decision. To the extent that the ALJ referenced X-ray and MRI results as a basis for the physical RFC, these imaging studies had been interpreted by medical professionals. *See* Tr. 14 (citing Tr. 742–43, 811–12). "An ALJ does not impermissibly play doctor or interpret raw medical data when she merely discusses imaging that is already read and interpreted by a radiologist." *Manzanalez v. Comm'r of Soc. Sec.*, No. 3:25-cv-01475, 2026 WL 1733187, at *12 (N.D. Ohio June 16, 2026) (citation omitted), *report and recommendation adopted*, 2026 WL 2045331 (N.D. Ohio July 15, 2026); *Lee M. v. Bisignano*, No. 3:24-cv-00615, 2025 WL 2164548, at *4 (W.D. Ky. July 30, 2025) (holding that the ALJ did not play doctor by merely

recounting other physicians' interpretations of the diagnostic imaging from the record). In short, the ALJ did not err.

**Conclusion**

For all the reasons stated, I affirm the Commissioner's decision.

Dated: November 20, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge